IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JULIE BETH MACZKOWICZ,
    Plaintiff,

vs.                                                 Case No.: 3:14cv192/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
    Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

        This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 4, 5). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

        Plaintiff challenges the decision of the Administrative Law Judge ("ALJ") on grounds that: (1) the ALJ, while finding Plaintiff to have severe impairments at step two of the sequential analysis, did not consider all of Plaintiff's impairments; and (2) made an erroneous assessment of Plaintiff's Residual Functional Capacity ("RFC") by failing to give substantial weight to the medical opinion of Plaintiff's treating physicians.

        Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence and application of proper legal standards; thus, the decision of the Commissioner should be affirmed.

I.        PROCEDURAL HISTORY

On June 30, 2010, Plaintiff filed an application for DIB, alleging disability beginning June 1, 2005. On October 14, 2010, and November 24, 2010, Plaintiff's application was denied initially and upon reconsideration, respectively. Plaintiff then requested a hearing before an ALJ, and a hearing was held on March 27, 2012. On May 18, 2012, ALJ Kim McClain Leazure issued her decision denying benefits (doc. 7-2 at 12–29). Plaintiff sought review of the ALJ's decision, which the Appeals Council denied on February 18, 2014 (doc. 7-4 at 2–4). The ALJ's decision thus stands as the final decision of the Commissioner, and is properly subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

II.   FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 12–29):

1. The claimant last met the insured status requirements of the Act on June 30, 2007.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2005, through her date last insured of June 30, 2007 (20 C.F.R. § 404.1571, *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: gastroesophageal reflux disease ("GERD")/ulcerative colitis, asthma, tobacco abuse, and chronic back pain (20 C.F.R. § 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the RFC to perform a reduced range of light work as defined in 20 C.F.R. § 404.1567(b), in function by function terms (SSRs 83-10 and 06-8p), with certain non-exertional restrictions associated with that level of exertion. The claimant's specific capabilities during the period of adjudication have been the ability to lift and carry no more than 20 pounds occasionally and 10 pounds frequently; stand and walk no more than 6 hours in an 8-hour day; sit up to 6 hours in an 8-hour workday; attend and concentrate for two hours at one time before needing a break; adapt

to occasional changes in work settings and routines; understand, remember and carry out short, simple work instructions; make judgments regarding simple work-related decisions; and have occasional contact with the public, coworkers, and supervisors. Time off-task can be accommodated by normal breaks; however, the claimant may require one to two extra five-minute restroom breaks during the day. The claimant could work in a job that would not require her to climb ladders/scaffolds, crouch or crawl, and which would require only occasional exposure to humidity and wetness and environmental pollutants.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on September 26, 1964, and was 42-years-old, which is defined as a younger individual aged 18–49, on the date last insured (20 C.F.R. § 404.1563).

8. The claimant has a marginal education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. § 404.1568).

10. Through the dated last insured, considering the claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569 and 404.1569(a)). The claimant, therefore, was not under a disability, as defined in the Act, at any time from June 1, 2005, the alleged onset date, through June 30, 2007, the date last insured (20 C.F.R. § 404.1520(g)).

III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with

or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20

    C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.  HEARING TESTIMONY

At Plaintiff's hearing before the ALJ, held March 27, 2012—or nearly five years after her date last insured—she testified that she was last employed in 2005, having quit work because of back pain and embarrassing accidents at work from her ulcerative colitis which caused frequent diarrhea (Tr. 50). The claimant said that she had at least ten diarrhea attacks per day, for which she would spend "[m]ost all of the day" either lying in a fetal position trying to breathe or running to the bathroom (Tr. 49). These difficulties occurred "even as early as 2007" and had been occurring continuously through the time of the hearing, such that she had brought a change of clothing and hygiene items to the hearing in case she had an accident (Tr. 49–50, 54). Plaintiff stated that she would also have cramps which sometimes induced nausea (Tr. 50). Plaintiff further indicated she quit working in 2005 because of pain in her back that also produced numbness in her right leg and occasionally caused her to fall (Tr. 51–52). Plaintiff stated she was diagnosed with chronic obstructive pulmonary disease ("COPD") in 2002, which she treated with inhalers and a nebulizer, but which became progressively worse, to the point that it interfered with her work (*id.*). Plaintiff

noted that during this same time period, she also suffered from carpal tunnel syndrome and had mental health issues such as depression, anxiety, and PTSD (Tr. 53–54).

V.   MEDICAL EVIDENCE (including evidence from outside the time frame relevant to Plaintiff's claims (June 1, 2005 through June 30, 2007)).

As it pertains to Plaintiff's history of gastrointestinal problems, a colonoscopy was performed by James W. Smith, M.D., on November 14, 1991 (Tr. 1730–31). Plaintiff was found to have "moderately severe focal colitis with resolving areas of aphthous ulceration, rectum to cecum" but no active, infectious colitis or Crohn's colitis (Tr. 1730). On March 1, 1993, another colonoscopy was performed by Dr. Smtih, along with hemorrhoidal sclerotherapy to address Plaintiff's large, internal hemorrhoid, and the results were normal (Tr. 1726–29). On March 28, 2001, another colonoscopy was performed by Dr. Smith relative to Plaintiff's complaints of chronic, intermittent diarrhea and hematochezia, as well as a panendoscopy relative to her history of reflux (Tr. 1721–24). While Plaintiff had diarrhea as a presenting problem, she reported that, since she began taking Welbutrin approximately two weeks before the appointment, she had been constipated and was straining to pass her stools, which had become hard (Tr. 1723). The colonoscopy returned a normal result with small hemorrhoids (Tr. 1722). The panendoscopy found mild gastritis and was otherwise normal (Tr. 1721). Another colonoscopy was administered on August 12, 2003, and returned normal results with no evidence of inflammation (Tr. 1101-02).

As is relevant to the time period spanning from Plaintiff's alleged onset date of June 1, 2005, through her date last insured of June 30, 2007 ("the eligibility period"), on April 5, 2005, Plaintiff sought medical help from internist Thomas P. Brown, D.O., for her back pain (which will be detailed *infra*), who noted Plaintiff's statement during the visit that she was "having no difficulties with her bowel or bladder capabilities since the onset of the pain" (Tr. 934). Plaintiff was also seen at the Sawyer Surgery Clinic by David H. Hayes, M.D., on October 21, 2005, for hemorrhoids and was diagnosed as having a thrombosed hemorrhoid approximately the size of a pea (Tr. 923, 925). Treatment notes from the visit state that Plaintiff complained of difficulty with defacation and that she was "having to do a lot of straining" (Tr. 925).

After an apparent gap in medical consultation, Dr. Smith again saw Plaintiff on an office visit on July 13, 2010 (Tr. 447–51). Dr. Smith noted Plaintiff's "myriad of GI problems," including her "longstanding" history of ulcerative colitis (Tr. 449). He described that she uses Imodium and

Lomotil for her "breaktrough diarrhea" for which she has "recently had multiple stools throughout the day, sometimes upwards of 16 per day" with occasional bleeding and mucus (Tr. 449). He further noted Plaintiff's dysphagia, "nausea since the time of her tonsillectomy earlier this year," COPD, anxiety, and GERD, which was "uncontrolled with breakthrough symptoms despite maximal PPI therapy" and for which laparoscopic fundoplication surgery was being scheduled (Tr. 449). On September 9, 2010, Dr. Smith detailed the results of an esophageal motility study related to her GERD, which produced a normal result "except for paristatic esophageal contractions" (Tr. 445). On a December 16, 2010, visit, he specifically noted Plaintiff's complaint of diarrhea and that "[s]he wears a diaper because when she passes gas some liquid will come out" (Tr. 472). He also noted that inflammatory bowel disease was not evident (*id*.). On a January 13, 2011, visit, Dr. Smith noted that Plaintiff was having several months of abdominal pain (Tr. 462). He also noted that Plaintiff wanted to have pyloroplasty surgery but that, because of the risk involved, Dr. Noyes wanted to do the more conservative intervention of fundoplication (*id*.). On March 3, 2011, Plaintiff complained of an increase in her diarrhea symptoms as she was having twelve to fifteen loose stools per day (Tr. 460). She stated "she has to take Lomotil just to leave the house which gives her some relief" (*id*.). On April 25, 2011, Dr. Smith discussed the results of Plaintiff's colonoscopy, which was normal but that "random biopsies did suggest . . . mastocytic enterocolitis" (*id*.). He noted that he would like to treat her empirically with a course of Entocort (*id*.). On June 24, 2011, he noted that stool studies for Plaintiff were all normal, as was a CT scan of her abdomen (Tr. 442–44).

On July 29, 2010, Plaintiff was seen at the Naval Hospital Surgery Clinic for her GERD problem (Tr. 853–55). Plaintiff reported fecal incontinence which had worsened since she began using proton pump inhibitor therapy for her reflux (Tr. 853). It was determined that Plaintiff had "failed medical therapy" for her GERD, and accordingly the option of surgery was discussed with her (Tr. 854). On September 21, 2010, Plaintiff saw Lachland D. Noyes, M.D., for help with her GERD problem (Tr. 861–65). Dr. Noyes noted that Plaintiff had a twenty-year history of GERD with regurgitation and esophagitis (Tr. 861, 864). Based on his own findings and a September 21, 2010, esophageal study provided by Dr. Smith, Dr. Noyes considered Plaintiff a viable candidate for anti-reflux surgery (Tr. 863–64). Dr. Noyes also noted Plaintiff's reports of being diagnosed with ulcerative colitis since 1991 and that she has developed symptoms of abdominal pain and

frequent bowel movements which contain mucus and blood and which number on average six bowel movements per day but as many as fourteen bowel movements per day during active flare-ups (Tr. 861). On January 19, 2011, Dr. Noyes performed the laparaoscopic Nissen fundoplication procedure (Tr. 1504–08).

During or proximate to the time of Plaintiff's alleged onset date, she was treated for exacerbations of her asthmatic bronchitis and COPD. Plaintiff was seen at the Pensacola Naval Hospital on November 10 and 11, 2004, because of airway difficulties due to asthma (Tr. 1117–27). Plaintiff complained of wheezing which was confirmed by physical exam. A chest x-ray was unremarkable, and her lungs were found to be clear (Tr. 1275). She was treated with steroids for bronchitis and released, and during a follow up examination on November 15, 2004, she was seen as stable but still with a cough that produced large amounts of mucus (Tr. 1114). Plaintiff was released with instruction to continue her current medications (*id.*). A further follow-up examination at the Naval Hospital Outpatient Clinic on November 29, 2004, found that the attack that prompted the hospital visit was under control as Plaintiff was no longer coughing or experiencing shortness of breath (Tr. 947). Plaintiff returned to the clinic on March 29, 2005, with a productive cough, increased shortness of breath, and intermittent low grade fever (Tr. 944–45), and she was again seen on April 4, 2005, with much the same symptoms (Tr. 937–38). She was provided Tequin and restarted on prednisone (Tr. 938). Plaintiff was again seen at the clinic on the following day, April 5, 2005, because of an onset of pain in her lower back radiating into her right leg (Tr. 934).

In and around December 24 through 26, 2007, Plaintiff had a flare-up of her COPD symptoms with an infection and difficulty breathing, for which she was seen at the Enterprise Medical Clinic in Enterprise, Alabama (Tr. 1540–42). X-rays taken at the facility were negative, no gastrointestinal problems were evident, and Plaintiff was not in distress (Tr. 1542). It was commented that Plaintiff's "biggest problem is that she is a heavy smoker and she has already got some COPD, asthma type problems" (Tr. 1541). Though complaining of pronounced wheezing and congestion, she was stabilized with medication and breathing treatments, after which she elected to go home with an increased dosage of steroids, so that she could tend to her grandchildren during the Christmas holiday (Tr. 1540).

Regarding her issues with back pain, Plaintiff was seen by Dr. David Chandler on September 18, 2003, for back pain radiating to the right lower extremity with numbness and tingling, which Plaintiff stated had begun ten months prior after she had lifted a heavy picnic table (Tr. 1074–80). Plaintiff stated that her back condition was improved until she had recent congestion problems, during which her coughing exacerbated the pain and numbness symptoms (Tr. 1078). X-rays revealed mild scoliosis in the right apex lumbar but no other abnormalities. Dr. Chandler ordered an MRI of her lumbar spine, but otherwise referred her to physical therapy, prescribed Tylenol #3 for pain on an as needed basis, and noted she was already taking Vioxx (Tr. 1078–79).

At a November 6, 2003, follow-up appointment with Dr. Chandler, Plaintiff reported continued numbness and tingling down to her right foot, as well as weakness which sometimes resulted in her leg giving way (Tr. 1071–73). Plaintiff stated that physical therapy did not help the problem (Tr. 1071). Dr. Chandler noted that Plaintiff's MRI, taken on October 21, 2003, showed a "right anterior posterior disc bulge at L4-5 with an annular tear which narrows the right lateral recess and may contact the right L4-5 nerve root at that level" (Tr. 1072). Plaintiff was diagnosed with lumbar spondylosis, disk protrusion, back pain, and sciatica (*id*.). Noting that an epidural injection was being arranged, Dr. Chandler referred Plaintiff to the same pain management physician her sister was using and to physical therapy for a trial of a TENS unit (Tr. 1072–73). Dr. Chandler was "not enthusiastic about" a diskectomy, preferring a "decompression and nucleoplasty procedure" should the above measures not suffice, and he thought Plaintiff had a "lower positive prognosis" (*id*.). He opined that Plaintiff might be a candidate for a spinal fusion if she did not respond to all of the above (Tr. 1073).

Plaintiff saw Craig C. Cartia, M.D., for pain management of her back condition on April 6, 2004 (Tr. 1059). Dr. Cartia noted Dr. Chandler's diagnosis of Plaintiff's disk protrusion at L4-L5 with radiculopathy and also that Plaintiff had had a recent discogram which showed "no obvious discogenic source to her pain" (*id*.). Dr. Cartia thereby opined that "the disk protrusion irritating the nerve root is the likely source of her pain symptoms" (Tr. 1053). He noted Dr. Chandler's previous assessment favoring a more conservative treatment approach to an open discectomy, and Dr. Cartia opined that a diagnostic block at L5 would be a necessary preliminary step to make sure

that the L4-5 area was in fact the source of Plaintiff's pain (*id*.). In discussion with Plaintiff, Dr. Cartia found that she preferred a more conservative approach (*id*.).

Plaintiff again saw Dr. Cartia on June 7, 2004, who noted that Plaintiff's epidural injections had not provided a significant improvement. He provided a lumbar neuroforaminal injection to determine if there was an annular tear at the L4-5 that might be causing her radicular symptoms. He also performed a lumbar discogram which did not produce pain at L4-5 or at L5-S1 (Tr. 1046–47). On a June 15, 2004, follow-up office visit, Dr. Cartia noted that the selective nerve root block he had performed brought relief. He also noted: "Strangely enough even with the discogram with an annular tear, she had no pain on injection." Dr. Cartia decided to refer Plaintiff back to Dr. Chandler to determine her best long-term treatment option. He provided her with a prescription for Darvocet to be used as needed, and he noted her statement that she had used about 45 tablets of Darvocet over the past 12 months (Tr. 1036).

On April 5, 2005, Plaintiff again sought medical help and was seen by Thomas P. Brown, D.O., an internist at the Outpatient Clinic at Pensacola Naval Hospital. Dr. Brown noted Plaintiff's "longstanding history" of chronic back pain and her MRI results which were consistent with disc bulging "contacting the right nerve root." He also noted that Plaintiff was last seen for her problem by Dr. Cartia, approximately eight months prior. Dr. Brown's assessment was chronic back pain, ruling out herniated nucleus pulposus, and he prescribed a home course of physical therapy. He also opined that the prednisone Plaintiff was taking at the time for her COPD, combined with her "nonsteroidal," would help to relieve her pain symptoms (Tr. 934–35).

Plaintiff arranged a medical visit on July 5, 2006, evidently seeking to establish care with a provider at Enterprise Medical Center; the clinical notes indicated that Plaintiff had reported her pain to not be an issue (Tr. 1553). In February 2007, Plaintiff again visited the clinic with complaints of headaches but also reporting she was not in pain and that her COPD symptoms were not problematic and under control (Tr. 1551–52). In April 2007, Plaintiff again visited the clinic and reported headaches and a spell of nausea about three weeks prior that lasted 20 to 25 minutes; she again reported no pain (Tr. 1550).

Plaintiff was seen by Alan D. Prince, M.D., on May 5, 2008, to address her back pain as well as carpal tunnel syndrome. Dr. Prince performed an electromyogram/nerve-conduction procedure

that revealed some mild lumbar radiculopathy in the L5 region and "some mild slowing of the sensory nerves in the foot of questionable significance." He did not think "we should pursue this further especially surgically unless it worsens." Dr. Prince also opined that Plaintiff should be referred to an orthopedist for cortisone injections should her carpal tunnel issues worsen (Tr. 1532–33).[1] On October 11, 2011, back surgery in the form of a L4-5 posterior lumbar interbody fusion was performed on Plaintiff by Christopher Neumann, M.D. (Tr. 1690–92, 1714).

As it concerns her mental health, on June 8, 2007, Plaintiff visited the Enterprise Medical Center clinic with a complaint of anxiety, hyperactivity, and an increase in her diarrhea symptoms. The provider prescribed Zoloft and Xanax for her anxiety (Tr. 1548–49). On a July 19, 2007, follow-up appointment, Plaintiff reported that her symptoms had improved (Tr. 1546).

On July 9, 2010, Plaintiff went to the Lakeview Center with symptoms of stress, depression, anxiety, obsessive-compulsive disorder ("OCD") and nightmares. A psychiatric evaluation waqs conducted by Kaberi Samanta, M.D., a psychiatrist, who noted she had had no prior psychiatric intervention beyond some brief counseling while working at the Naval Air Station in 1998 (Tr. 427). Dr. Samanta continued Plaintiff's prescription for Klonopin, stopped her Ambien since it was not helping her sleep, and started her on Seroquel for her sleeplessness and nightmares, Buspar for anxiety, and Prozac for her OCD and depression. He also referred Plaintiff to a psychologist or a mental health counselor (Tr. 429).

Dr. Samanta saw Plaintiff again for a follow-up visit on January 12, 2012. Plaintiff reported a lack of general activity, that her husband "does everything" while she has been recuperating from back surgery, and that she stays home unless she has a doctor's appointment. Dr. Samanta again recommended counseling, but Plaintiff related that she did not feel comfortable going to counseling. Dr. Samanta's impressions were post traumatic stress disorder, depressive disorder, and OCD, and he ruled out major depression and psychosis (Tr. 1555).

VI. DISCUSSION

    A. Step Two Analysis.

---

[1] A carpal tunnel release operation was performed on both of Plaintiff's wrists in September of 2011 (Tr. 1604–05).

Plaintiff first contends that the ALJ's findings during the second step of the five-step analysis described above were in error because, while determining that Plaintiff had certain impairments which were severe, the ALJ overlooked some of Plaintiff's other severe impairments.  Specifically, although the ALJ determined Plaintiff's ulcerative colitis, GERD, asthma, tobacco abuse, and chronic back pain to be severe impairments (Tr. 14), Plaintiff claims that her irritable bowel syndrome ("IBS") as well as her diarrhea, nausea, and anxiety were also severe impairments that the ALJ did not recognize as such.

At step two of the analysis, the proper determination is simply whether the Plaintiff has a condition with more than a minimal negative effect on her physical or mental ability to walk, stand, sit, lift, push, pull, understand and carry out simple instructions, use judgment, or perform other basic functions.  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985).  As the Eleventh Circuit has further explained:

> This step acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.  *See, e.g.*, Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Cantrell v. Bowen, 804 F.2d 1571, 1573 (11th Cir. 1986); McDaniel [v. Bowen], 800 F.2d [1026,] 1031 [(11th Cir. 1986)].

Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987) (emphases supplied).

Thus, all that is required at step two is for the ALJ to find that Plaintiff has a severe impairment; the ALJ need not identify any particular impairment or enumerate all the impairments that are found to be severe.  Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 824–25 (11th Cir. 2010).  So long as the ALJ proceeds to take all of Plaintiff's impairments into consideration when determining Plaintiff's capacity to work at steps three and beyond, any perceived error or omission during step two is non-prejudicial.  Perry v. Astrue, 280 F. App'x 887, 893–94 (11th Cir. 2008).

While the ALJ did not specifically mention IBS, diarrhea, nausea, or anxiety during step two of the analysis, it is evident throughout her opinion that these impairments were considered in her RFC assessment.  As the Commissioner's responsive memorandum (doc. 10) accurately contends, Plaintiff did not specifically allege IBS among her impairment claims, but the ALJ nonetheless considered Plaintiff's gastrointestinal symptoms as a whole, including her ulcerative colitis and her

symptoms of diarrhea, cramping, and nausea (Tr. 15–17, 22–23). Moreover, the record shows these symptoms to be mild, especially as they existed during Plaintiff's eligibility period, and the ALJ specifically noted that, despite Plaintiff's statements that she fought constant symptoms of diarrhea during that time, the record revealed her to complain more often of constipation than diarrhea. Last, the ALJ noted Plaintiff's complaint of anxiety during her eligibility period and, based at least partly on the fact that Plaintiff reported that she felt better two months after she had begun taking her prescribed medication, concluded that her anxiety and mental health impairments were not severe (Tr. 15).

      B.      Treating Physicians.

Second, Plaintiff contends that the ALJ erred by according no weight to the opinions rendered as to Plaintiff's disability by Plaintiff's treating physicians, specifically the opinions of Alicia L. Warnock, M.D., Allison Harvey, PA-C, and Dr. Smith.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. See Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Medical evaluations that are provided on preprinted forms do not provide persuasive evidence of the validity of the opinions expressed therein. See, e.g., Hammersley v. Astrue, No. 5:08cv245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions.") (citing Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985) (rejecting opinion from a non-examining physician who merely checked boxes

on a form without providing any explanation for his conclusions); Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545, 404.1546), or the application of vocational factors, because those ultimate determinations are the province of the Commissioner. 20 C.F.R. § 404.1527(d).

> Importantly,
>
> Where the medical record contained a retrospective diagnosis, that is, a physician's post-insured-date opinion that the claimant suffered a disabling condition prior to the insured date, we affirm only when that opinion was consistent with pre-insured-date medical evidence. *See Payne v. Weinberger*, 480 F.2d 1006, 1007–08 (5th Cir. 1973) (holding that the ALJ erred in determining that the claimant was disabled when a retrospective diagnosis, along with all other medical evidence, supported a finding of disability); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) (ruling that "[a] retrospective diagnosis may be considered only if it is corroborated by evidence contemporaneous with the eligible period" and citing cases from th[e] First, Second, Eighth, Ninth, and Tenth Circuits that were in accord).

Mason v. Comm'r of Soc. Sec., 430 F. App'x 830, 832 (11th Cir. 2011).

Finally, the ALJ may reject the conclusions of any medical expert if they are inconsistent with the record as a whole. *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

Case No.: 3:14cv192/EMT

As can be ascertained from the medical evidence summarized above, there is a relative dearth of medical information from which to adduce that Plaintiff had any kind of significant impairment during the eligibility period from June 1, 2005, to June 30, 2007. While Plaintiff may have opted to have back surgery in later years, or may have developed the type of constant diarrhea she complained of at the hearing before the ALJ, it is not born out in the record that her alleged impairments were anything beyond mild and manageable during her eligibility period. In seeming recognition of this, Plaintiff provides form evaluations from doctors who have more recently treated her in order to indicate that her various impairments, as the doctors have only more contemporarily observed, relate back to the time of her eligibility period. However, such retrospective diagnoses are unavailing.

The first of the treating physicians identified by Plaintiff, Dr. Warnock, is an internist who began treating her in 2010 (Tr. 55–56), and who on May 5, 2011, completed a Sedentary Requirements Checklist ("SRC") form. On the form, Dr. Warnock checked "No" to indicate that Plaintiff could not lift five pounds on a repetitive basis, lift and carry ten pounds, sit for up to six hours in a normal position, stand for up to two hours in an eight hour work day, sustain activity at a pace and with the attention to task as would be required in the competitive workplace, or attend any employment eight hours per day for five days per week (Tr. 432). Dr. Warnock also filled out a Clinical Assessment of Pain ("CAP") form, in which she circled responses on the form indicating that Plaintiff suffered from pain at levels that were distracting to the adequate performance of daily activities and work; that physical activity such as walking, standing and bending would cause an increase of pain to such an extent that bed rest and/or medication would be necessary; and that prescription medication side effects could be expected to be severe and to limit effectiveness due to distraction, inattention, or drowsiness (Tr. 433–34). On June 22, 2011, Plaintiff's representative sent a letter to Dr. Warnock asking her to indicate whether she was familiar with Plaintiff's medical history dating from at least June 1, 2005, and whether she believed the functional limitations that she indicated in the two forms identified above existed from at least June 1, 2005, to the present. Dr. Warnock checked "Yes" in the space provided under each question (Tr. 491).

The ALJ gave no weight to Dr. Warnock's opinion because Dr. Warnock was not a treating physician for Plaintiff during the eligibility period. Indeed, Dr. Warnock did not begin to treat

Plaintiff until at least 2010, approximately three years after her date last insured.  Dr. Warnock's findings with respect to Plaintiff's impairments during her eligibility period are therefore retrospective and subject to being discounted unless they can be corroborated by the record medical evidence during the eligibility period.  The ALJ found, however, that Dr. Warnock's findings were neither supported by the relevant record evidence nor for that matter by Dr. Warnock's own medical notes.

As previously stated, there is scant medical evidence during the eligibility period and, as is apparent from the medical evidence that does exist, Plaintiff's medical treatment at that time was conservative, and her ailments were generally resolved or at least stabilized at that level of treatment.

Further, as the ALJ discussed, Dr. Warnock's own treatment records for Plaintiff, although dated well after Plaintiff's eligibility period, do not support her evaluations of Plaintiff's impairments (Tr. 1579–81, 1589–93).  During a September 6, 2011, appointment, Dr. Warnock noted that, although Plaintiff had had an episode of constipation for which she went to the Emergency Room two weeks prior, the problem resolved at home (Tr. 508).  At a December 22, 2011, follow-up appointment after Plaintiff had been to the Emergency Room with a fever and difficulties breathing, Dr. Warnock noted Plaintiff was responding well to treatment for her bronchites, and her only complaint was for a laxative because she had not had a recent bowel movement (Tr. 1588).  At a February 7, 2012, appointment, Plaintiff stated she was having intermittent low back pain since her surgery for which she was using motrin (Tr. 1579).  Dr. Warnock gave Plaintiff "a small amount of Tramadol for prn [when necessary] use" and released her without limitations (Tr. 1581).

Similar to Dr. Warnock, Allison Harvey, completed a SRC form on June 27, 2011, wherein she indicated Plaintiff could not sit for up to six hours in an eight-hour day and could not be expected to work eight hours a day for five days per week.  Ms. Harvey identified Plaintiff's impairments as gastroparesis and IBS "causing significant abdominal pain and bowel dysfunction" (Tr. 486).  Ms. Harvey also completed a CAP form, indicating that Plaintiff's level of pain would be to such an extent that it would distracting to the adequate performance of daily tasks, and that physical activity such as standing, walking, and bending would cause distraction from or total abandonment of tasks (Tr. 487).  She also indicated that medications would cause limitations for

Plaintiff, but not to such a degree as to create a serious problem in most instances (Tr. 488). Ms. Harvey also indicated that Plaintiff would miss more than three days of work per month due to abdominal pain, nausea, and diarrhea (Tr. 489).

Ms. Harvey, as a physician's assistant, is not an "acceptable medical source" of evidence from which to establish a medical impairment. Lawton v. Comm'r of Soc. Sec., 431 F. App'x 830, 833–34 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1502; 404.1513(a)); 404.1513(d)(1)). The ALJ may nonetheless consider her opinions in determining the severity of Plaintiff's impairments, *see* 20 C.F.R. § 404.1513(d), but here again, Ms. Harvey did not appear to have been involved in Plaintiff's treatment during her eligibility period, and she did not indicate that she was familiar with Plaintiff's medical conditions during that time. Thus, even if she rendered an opinion as to Plaintiff's impairments specific to Plaintiff's eligibility period, that opinion would have been retrospective and in conflict with the record evidence from that period of time.

The third medical treating source, Dr. James Smith, is identified by Plaintiff as a gastroenterologist whom she has seen since 1991 (Tr. 55–56). However, as the Commissioner points out, the record contains treatment notes from Dr. Smith spanning from 1991 to 2001 and from 2010 to 2012 when Plaintiff evidently reestablished care with Dr. Smith. In other words, there are no treatment records from Dr. Smith that occurred during Plaintiff's eligibility period.

It was Dr. Smith who performed the series of colonoscopies from 1991 to 2001, and then, following a lapse, began seeing Plaintiff again for her GI problems in 2010, as detailed earlier (*see supra*). As the earlier records show, while Plaintiff may have had chronic gastrointestinal problems, those problems appeared to have been managed, and Plaintiff appeared to have more difficulty with constipation than with diarrhea. During Plaintiff's later visits to Dr. Smith in 2010 and after, her GERD and diarrhea symptoms appeared to become more pronounced, such that, as the Commissioner acknowledges, they might have caused the ALJ to consider that Plaintiff's functional limitations had increased. These findings, however, occurred well after Plaintiff's eligibility period.

In a letter dated February 20, 2012, Dr. Smith was asked by Plaintiff's representative to indicate whether he was familiar with Plaintiff's medical history dating back to June 1, 2005, and whether he believed the functional limitations that Ms. Harvey had identified in her SRC and CAP forms existed from at least June 1, 2005, to the present (Tr. 1569). Dr. Smith checked "Yes" to both

Page 18 of 19

of these questions (Tr. 491).[2] Nonetheless, as with previous treating sources, Dr. Smith's assessment was retrospective in nature and was properly discounted by the ALJ since it was not supported by medical evidence in the file relating to Plaintiff's eligibility period.

Finally, although Plaintiff does not specifically raise the findings of Dr. Samanta, contained in a Medical Source Statement as to Mental Residual Functional Capacity form and an Absences from Work form, both of which were completed on May 10, 2011, and then again on March 1, 2012 (Tr. 1559–67), the court has reviewed these forms as well.  In filling out these forms, Dr. Samanta indicated Plaintiff to have "marked" restrictions or difficulties in daily living, social functioning, responding to customary work pressures, and maintaining concentration, persistence, or pace in the timely completion of tasks (Tr. 1559–61, 1564–66).  He identified that she would have numerous side-effects from her medication such as drowsiness, lack of muscular control, and hallucinations (Tr. 1561).  Dr. Samanta also indicated that he would expect Plaintiff's impairments, identified as PTSD, depressive disorder, NOS with anxiety, and OCD, to cause her to miss more that three days of work per month (Tr. 1562, 1567).  Dr. Samanta also indicated that he was familiar with Plaintiff's medical history dating back from June 1, 2005, and that he believed the functional limitations he identified existed from that time (Tr. 1558).  As the record indicates, however, while Plaintiff's mental health symptoms may have increased in recent years, they were barely in evidence during the time of her eligibility and were effectively managed.  Thus, as has now become a familiar pattern, Plaintiff's treating physician's assessments for her mental health were retrospective in nature and properly discounted by the ALJ.

In sum, Plaintiff's impairments, to the extent they even could be considered severe enough to have caused her to be disabled, were evidenced only in the years following her eligibility period. As the ALJ commented, she reviewed the entire medical record with an eye toward trying to find if any of the clinical findings identified herein could fairly be found to relate back to Plaintiff's eligibility period, and was unable to do so (Tr. 25).  The court agrees, finding that the largely

---

[2] Because the record contains no SRC or CAP forms that were completed by Dr. Smith, and because both of those forms as completed by Ms. Harvey appear in the pages immediately following the letter to Dr. Smith, the court assumes that Dr. Smith was asked to comment on Ms. Harvey's answers on the form, even though the letter is unclear in this regard (Tr. 1569–73).  Thus, without expressly asking, the letter appeared to also ask Dr. Smith to adopt the findings of Ms. Harvey.  The ALJ interpreted this situation in the same manner as the court (Tr. 24).

conclusory, "checkbox" statements from the treating sources indicating that Plaintiff impairments were severe during her eligibility period, are insufficient to overcome the fact that their opinions were in retrospect and in conflict with a medical record that does very little to support their findings.

VII.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED**

The decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED.**  The clerk is directed to close the file.

**DONE AND ORDERED** this 25th day of September 2015.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**